**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BOBBY E. ANDREWS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 15 C 7192** |
| | ) | |
| **v.** | ) | **Magistrate Judge** |
| | ) | **Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Bobby Andrews ("Claimant") seeks judicial review under 42 U.S.C.

§405(g) of a final decision of Defendant Commissioner of the Social Security

Administration ("SSA") denying his claim for Social Security Supplemental Security

Income ("SSI") benefits under Title XVI of the Social Security Act ("the Act"). 42 U.S.C.

§1382a(a)(3)(A). The parties have consented to the jurisdiction of a United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c). Claimant asks that the court reverse

the decision of the Commissioner (Dkt. 18), and the Commissioner asks that the

decision be affirmed. (Dkt. 22, 23.) For the reasons that follow, Claimant's motion is

granted and the Commissioner's motion is denied. This case is remanded to the SSA

for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Procedural History

Claimant applied for SSI on May 16, 2012, alleging that he had been disabled

since January 31, 2008, due to short-term memory loss, seizures, and alcoholism. (R. 197-203, 232.) His application was denied initially and on reconsideration (R. 68-89), and he filed a request for an administrative hearing. (R. 131-33.) On July 17, 2014, an administrative law judge ("ALJ") convened a hearing at which Claimant testified and was represented by counsel. (R. 33-67.) In addition, Cheryl Hoiseth testified as a vocational expert ("VE"). (R. 56-67.) On August 28, 2014, the ALJ denied the Claimant's application for SSI, finding that he was not disabled because he was capable of performing his past relevant work as a custodian/institutional cleaner, as well as other jobs that exist in significant numbers in the national economy. (R. 15-27.) This became the final decision of the Commissioner when the Appeals Council denied the Claimant's request for review on July 2, 2015. (R. 1-3.) *See* 20 C.F.R. §§404.955; 404.981. That decision is now before the court for review under 42 U.S.C. §405(g).

## B. Factual Background

Claimant was born on June 18, 1966 (R. 197), making him 48 years old on the date of the ALJ's decision. He has a ninth-grade education, taking special education classes throughout his schooling and can "write a little bit, but . . . can't read." (R. 43.) Claimant has a limited work history. He was a school custodian from 2005 to 2008, and prior to that, worked sporadically as a laborer through a temp agency. (R. 216-17, 238-40.) He also briefly held a custodial job for three or four months in 2014, until he had a seizure at work. (R. 45.) Claimant is single and lives with his older sister. (R. 42)

## C. The Medical Record

The medical record begins with the Claimant presenting to the emergency room on June 12, 2012, after experiencing a seizure. (R. 341.) He said he had been binge

drinking and was off Dilantin, a medicine used to treat seizures.  (R. 342.)  The admission note indicates he was stressed and anxious.  (*Id.*)  Lab results confirmed his alcohol level was 0.19.  (R. 351.)  A month later, Claimant was back after suffering another seizure.  (R. 392.)  The event had lasted 3-4 minutes, according to a family member, and Claimant had bitten his tongue.  (*Id.*)  Examination confirmed abrasion and bite marks.  (R. 393.)  Claimant reported he had not taken Dilantin in a year and drank a six pack of beer a day.  (R. 392.)  Lab tests showed his Dilantin level was less than 0.8 – the therapeutic range is 10.0 to 20.0.  (R. 393, 401.)  A CT brain scan revealed no evidence of acute inter-cranial process.  (R. 398.)

Claimant began seeing Dr. Tais Crawford at Cook County Hospital Clinic for treatment in December of 2012.  (R. 423.)  On January 9, 2013, the doctor confirmed diagnoses of epilepsy, unspecified, and alcohol abuse, and ordered a prescription for phenytoin (or Dilantin).  (R. 495.)  She ordered lab work and instructed Claimant to return in six months.  (R. 497-98.)

The state disability agency arranged consultative physical and psychological exams for Claimant on January 19, 2013.  (R. 411-14, 416-19.)  At the physical exam, Dr. Lopez observed Claimant to be alert and oriented.  (R. 414.)  Claimant had a normal gait, normal range of motion in his spine and all extremities.  (R. 413.)  Motor strength and grip strength were both normal.  (*Id.*)  Reflexes and sensation were normal as well.  (R. 414.)  Dr. Lopez reported Claimant's affect was normal, his memory was intact, and there was no sign of depression or anxiety.  (*Id.*)

Dr. Michael Stone performed the consultative psychological exam.  (R. 416.)  Claimant denied abusing alcohol at that time and said he was attending AA meetings.

(*Id.*)  He said his cousin helped him with things like filling out forms.  (*Id.*)  Dr. Stone reported that Claimant's affect was depressed and anxious; his mood was dysthymic and dysphoric.  (R. 417.)  Thought content was positive for depression and anxiety, but there was no suicidal ideation.  (*Id.*)  Dr. Stone noted that Claimant had difficulty maintaining a consistent level of attention and concentration during the examination. (*Id.*)  There was evidence of impaired memory: Claimant could recall three objects immediately and after one minute, but not after three or five minutes.  (R. 418.)  He was able to identify the President but not the Mayor.  (*Id.*)  He could identify four large cities in the United States, but not the past four Presidents.  (*Id.*)  Even simple mathematical calculations were somewhat difficult for Claimant.  (*Id.*)  He didn't grasp that a hat and a shirt were both clothing, or that an apple and a banana were both fruit.  (*Id.*)  He didn't understand the meaning of common proverbs.  (*Id.*)

Dr. Stone concluded that Claimant suffered from depressive disorder and generalized anxiety disorder, in addition to memory problems, a seizure disorder and a history of alcohol abuse.  Claimant's prognosis was guarded.  (R. 419.)  Dr. Stone didn't feel he would be capable of managing his own funds if he were granted benefits.  (*Id.*)

In February 2013, state agency physicians reviewed the file and the results of the consultative exams in order to assess Claimant's residual functional capacity ("RFC") assessment, among other things.  (R. 76-88.)  As related to his mental health, Dr. Terry Travis determined that Claimant's depression and anxiety amounted to severe impairments.  (R. 81.)  In his view, Claimant suffered from moderate limitations in activities of daily living, social functioning, and concentration, persistence and pace. (*Id.*)

Claimant returned to the County Hospital Clinic in May 2013 for a refill of his medication and lab tests. (R. 480.) He saw Dr. Crawford for a follow-up on his seizure disorder on August 12, 2013. (R. 458.) He reported that he had passed out on July 29, 2013. (*Id.*) Dr. Crawford noted he had been compliant with his medications. (*Id.*) Lab tests showed elevated levels of glucose, cholesterol, and triglycerides. (R. 459.) Claimant reported he suffered from intermittent headaches. (R. 460.) Dr. Crawford increased Claimant's Dilantin dosage. (R. 461.)

On October 25, 2013, Claimant had another appointment with Dr. Crawford for a check-up and a refill of his prescription. (R. 450.) He denied feeling depressed or hopeless over the previous two weeks. (R. 451.) Dr. Crawford completed a Seizures Medical Source Statement for Claimant's attorney on October 31, 2013. (R. 423-26.) She indicated Claimant suffered from convulsive seizures and had hyperlipidemia. (R. 423.) He had no warning of his seizures and lost consciousness and bit his tongue during episodes, which occurred twice a week. (R. 423, 424.) Claimant described them as headaches accompanied by tremors. (R. 423.) Dr. Crawford felt Claimant was capable of low stress work. (R. 424.) Exertion could bring on a seizure; he should not lift more than ten to twenty pounds occasionally. (R. 424-25.) They resulted in loss of vision focus and light-headedness. (R. 425.) Dr. Crawford reported Claimant was compliant with taking medication, but missed dosages on July 29, 2013. (*Id.*) She added that Claimant had poor self-esteem, short attention span, and memory problems. (R. 426.)

Claimant had additional lab tests done on October 31, and November 13, 2013. (R. 436-37, 441.) On March 10, 2014, during another visit with Dr. Crawford, Claimant

complained of dizziness and giddiness.  (R. 432.)  Claimant told the doctor he had been off alcohol for a few months.  (R. 502.)  Liver function tests were abnormal.  (R. 432.)  Dr. Crawford noted Claimant had been adherent to his medication regimen and increased his Dilantin dosage.  (R. 502, 505.)  Lab work showed that his cholesterol and triglycerides levels were elevated.  (R. 503.)  His last EEG in December 2013 was normal.  (R. 432.)  Claimant denied being hopeless or depressed over the previous two weeks.  (R. 504.)

### D. The Administrative Hearing

#### 1. Claimant's Testimony

At his administrative hearing, Claimant testified that he began having seizures when he was a child, and that they worsened with age.  (R. 50.)  The last job he held for an extended period of time was as a custodian at a school.  (R. 44.)  He said he had to leave that job in 2008 because he had a couple of seizures and fell and hurt his back. (*Id.*)  He worked briefly as a janitor early in 2014 but, again, that job ended when he had a seizure while at work.  (R. 44-45.)  He had hoped to keep that job indefinitely; he had been briefly homeless just before that.  (R. 51.)

Now, on a typical day, he did very little: "[b]asically just get up and sit outside." (R. 45.)  When he couldn't sit outside, he would stay in and watch TV.  (R. 47.)  He was able to shower and dress himself, but he didn't cook.  (R. 46.)  His sister took care of that.  (*Id.*)  She also did the grocery shopping, but he sometimes went with her.  (R. 47.) He has trouble filling out forms; someone usually has to do that for him.  (R. 49-50.)

The Claimant testified that he went to AA meetings and hadn't used alcohol for about a year.  (R. 47.)  When he drank, he didn't drink every day, but would binge drink

on the weekends. (R. 51.) He was on Medicaid. (R. 54.) He explained that he took

Dilantin for his seizures because "they gave [him] some," but that he couldn't take any

other medicines – such as for his blood pressure – because he didn't have the money to

pay for them. (R. 48.) The Dilantin made him sleepy. (R. 49.) Although he had been

diagnosed with depression and anxiety disorder, he said his doctor hadn't given him any

medication for those conditions yet, but she was going to. (*Id.*)

Claimant told the ALJ that he last had a seizure a week before the hearing, even

though he was taking his Dilantin. (R. 50.) Since he had been on Dilantin, he had been

having a seizure once every two or three months. (R. 52.) Before that, he would have

episodes once or twice a month. (R. 52.)

## 2. Vocational Expert's Testimony

The VE also offered testimony at the hearing. She characterized Claimant's past

custodial work as an institutional cleaner under the Dictionary of Occupational Titles

("DOT"), and explained that it was heavy work (performed at a light level by Claimant),

unskilled, and had a specific vocational preparation level ("SVP") of 2. (R.58-59.) The

ALJ then asked the VE to consider an individual with the Claimant's educational level

and work background, who could work at all exertional levels, but who could not climb;

could not be exposed to noise or workplace hazards; who was limited to performing

simple, routine, repetitive tasks consistent with unskilled work; who could have no more

than superficial interactions with co-workers, supervisors and the public; and who could

adjust to routine changes in a work setting and make simple work-related decisions. (R.

59.)

When asked if such an individual could perform Claimant's past work, the VE said

that he could, either as Claimant performed it or as generally performed in the national economy.  (R. 59.)  The VE added that there were other jobs – dining room attendant, kitchen helper, and janitor – that such an individual could perform.  (R. 59.) All of these jobs were medium and SVP level 2.  (R. 59-60.)  So, in response to the ALJ limiting the hypothetical individual to medium work, the VE testified that such an individual could still handle those jobs.  (R. 59.)  The VE said her testimony was consistent with the DOT. (R. 61.)

When questioned by Claimant's attorney, the VE testified that the jobs she listed involved one- or two-step instructions.  (R. 64.)  She could not say whether they were one- or two-step jobs because she did not have any resources that measured the steps of jobs.  (R.  64.)

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Stepp*, 795 F.3d at 718.  We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011).  "We 'conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's

decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues.'"  *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014) (quoting *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005)).

In that discussion of the issues, while the ALJ is "not required to mention every piece of evidence," she must provide "an accurate and logical bridge" from the evidence to her conclusion.  *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016).  Along the way, the ALJ cannot ignore evidence favorable to the claimant, but must explain why it was rejected.  *Id.*  In short, the ALJ's discussion of the evidence and the issues must be sufficiently detailed to allow the Court to trace the path of her reasoning.  *Schmidt v. Barnhart*, 395 F.3d 737, 747 (7th Cir. 2005).

### B. Analysis Under the Social Security Act

In order to qualify for benefits, a claimant must be "disabled" under the Act.  A person is disabled under the Act if he or she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c.  In determining whether a claimant is disabled, the ALJ employs a five-step inquiry, asking: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).  The claimant has the burden of establishing

a disability at steps one through four. *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). If the claimant succeeds, the burden shifts to the Commissioner to show that the claimant is capable of performing other work in the national economy. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

**C. The ALJ's Decision**

In this case, the ALJ determined at step one that Claimant had not engaged in substantial gainful activity since the date of his application for SSI. (R. 17.) At step two, the ALJ found that Claimant suffers from the severe impairments of a seizure disorder and a learning disability. (R. 17-18.) The ALJ then determined, at step three, that Claimant did not have an impairment or combination of impairments that met or equaled the severity of one of the conclusively disabling impairments listed in 20 C.F.R. Part 404, Subpart P, App'x 1. (R. 18.) Next, the ALJ determined that, despite Claimant's impairments, he still had the RFC to perform work at all exertional levels, but which did not require climbing ladders, ropes or scaffolds or involve concentrated exposure to noise and workplace hazards. (R. 20.) The ALJ further found that the Claimant was limited to performing simple, routine and repetitive tasks consistent with unskilled work, as long as that work did not involve more than superficial interaction with co-workers, supervisors, or the general public, and did not require adjustment to more than routine workplace changes or more than simple work-related decisions. (*Id.*)

At step four, the ALJ determined that, given the Claimant's RFC, he could still perform his past work as a custodian/institutional cleaner. (R. 25.) Alternatively, at step five, the ALJ found that, based on the VE's testimony and the Claimant's age, education, and work experience, there were other jobs existing in significant numbers in the

10

national economy that the Claimant could perform.  (R. 26.)

## III. DISCUSSION

The Claimant raises three issues with the ALJ's decision that he contends necessitate a remand.  First, the Claimant contends that the ALJ erred by failing to find that his depression and anxiety were severe impairments.  Second, Claimant argues that the ALJ's determination of his RFC was flawed.  And, finally, the Claimant submits that the ALJ erred in assessing his allegations as to his limitations.

### A. Claimant's Psychological Impairments

Claimant feels the ALJ gave short shrift to his psychological impairments – anxiety and depression – by disregarding them as severe impairments.  In reaching her determination that these impairments were not severe, the ALJ reviewed the medical evidence regarding them.  She reviewed the report from Dr. Stone, who examined Claimant at the request of the state disability agency, and who diagnosed Claimant with depression and anxiety disorder.  The ALJ acknowledged that Dr. Stone found Claimant to be in the borderline to low average range of intellectual functioning and had difficulty maintaining concentration.  The ALJ also considered the psychological assessments from the state agency reviewers.  She gave the initial assessment "little weight" as there was insufficient evidence to arrive at an opinion at the time it was done.  (R. 24.)  She gave the later report of agency consultant Dr. Travis "some weight."  (*Id.*)  In that report, Dr. Travis found Claimant moderately limited in several areas and concluded that his anxiety and depression were severe impairments.  But the ALJ felt the opinion was not consistent with the record of lack of treatment, medications, and hospital stays.

From there, the ALJ found that Claimant had moderate limitations in carrying out

11

the activities of daily living, social functioning, and maintaining concentration, persistence, and pace, echoing many of the findings of Dr. Travis. But the ALJ parted company with Dr. Travis and Dr. Stone when she concluded that Claimant did not have a severe mental impairment. Claimant takes issue with that analysis, and rightfully so.

As already noted, at step two, the ALJ must determine whether the Claimant has a severe impairment. A severe impairment is an "impairment or combination of impairments which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.1520(c), 416.921(a). "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at [step two] when medical evidence establishes only a *slight* abnormality or a combination of *slight* abnormalities which would have no more than a *minimal* effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (*i.e.,* the person's impairment(s) has no more than a *minimal* effect on his or her physical or mental ability(ies) to perform basic work activities)." *Bowen v. Yuckert,* 482 U.S. 137, 154, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)(quoting SSR 85–28 (emphasis supplied)). The Seventh Circuit has explained that the step-two determination is "a *de minimis* screening for groundless claims intended to exclude slight abnormalities that only minimally impact a claimant's basic activities." *O'Connor-Spinner v. Colvin*, – F.3d –, –, 2016 WL 4197915, at *6 (7th Cir. Aug. 9, 2016).

On the other hand, the Commissioner's regulations rate the degree of limitation in functional areas like concentration on a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 416.920a(c)(4). The regulations provide no real definition of these levels, other than to state the obvious: that "marked" is "more than moderate, but

less than extreme." 20 CFR Pt. 404, Supt. P, App. 1, 12.00(C). A marked limitation is one that "seriously interferes with your ability to function independently, appropriately, effectively and on a sustained basis." 20 CFR Pt. 404, Supt. P, App. 1, 12.00(C). There's little to glean about what constitutes a moderate limitation from this other than it would be more than mild, but less than marked. Even so, it would seem that an individual with moderate limitations in carrying out daily activities, social functioning, and maintaining concentration, persistence, and pace would have more than a "slight abnormality", and would pass the "de minimis" hurdle and suffer more than "minimal effects" on basic work activities. The ALJ's reasoning here is difficult to follow.

It's even harder to follow because, to get to the conclusion that Claimant's psychological impairments were non-severe, the ALJ had to reject the opinions of the only two mental health professionals who assessed Claimant's psychological condition. Both Dr. Travis, who reviewed the medical record on behalf of the state disability agency, and Dr. Stone, who had Claimant in for a consultative examination the state agency arranged, felt Claimant's psychological impairments were severe. The ALJ went in the other direction, though, and rejected these opinions based on lack of treatment for depression and anxiety, and notes from Claimant's treatment with Dr. Crawford at Cook County Hospital, which the ALJ characterized as "support[ing] denials of depression." (R. 24.)

Again, these are the only two psychological assessments in the record. Rather than relying on them, the ALJ came up with her own conclusion. The Seventh Circuit has repeatedly cautioned ALJs about "playing doctor." Most recently, in *O'Connor-Spinner*, the Seventh Circuit remanded the ALJ's decision where the ALJ rejected the

13

opinions of treating doctors and found that the claimant's major depression was non-severe. 2016 WL 4197915, at *6. At least in that case, the ALJ had the opinion of a reviewing physician – which the Seventh Circuit found woefully unconvincing – to go on. 2016 WL 4197915, at *3. Here, the ALJ had no other psychological opinions to consider to reach her conclusion that Claimant's mental impairment, despite leaving him with moderate limitations in a number of areas, was only a slight abnormality.

An ALJ can reject medical opinions, be they from treating, examining, or reviewing doctors, as long as she provides good reasons for doing so. *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). The fact that the ALJ rejected the opinions of two of the agency's own doctors is a red flag and a good explanation is required. *See Beardsley*, 758 F.3d at 839 ("But rejecting or discounting the opinion of the agency's own examining physician . . . can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step."). The ALJ provided two: lack of treatment and notes from Dr. Crawford. They are both flimsy reeds to support the rejection of the only medical opinion about Claimant's psychological impairments in the record and, as a result, this matter must be remanded to the Commissioner.

First, an ALJ has to consider whether there are reasons for lack of treatment. *See Cole v. Colvin*, – F.3d –, –, 2016 WL 3997246, at *3 (7th Cir. July 26, 2016)(". . . the administrative law judge should have asked him why he had had essentially no treatment during that period."). "Mental illness in general . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006). An individual with a mental illness might be

embarrassed to seek treatment, or might not even understand what is wrong. That's a factor that is underscored here as, in addition to his depression and anxiety, Claimant has also been noted to have borderline intellectual functioning. Even the ALJ determined he had a severe learning disability. These are points that the ALJ ought to have explored before rejecting medical opinions based on Claimant's treatment record.

That leaves Dr. Crawford's notes. The ALJ says that these notes undermine the opinions from Drs. Stone and Travis because the notes support denials of depression. She does not cite to any specific instances in those notes, which cover over a year of treatment for seizures, from January 9, 2013, through March 10, 2014. Review of those notes reveals that, over the course of nine visits, Claimant was asked whether he had been depressed over the previous two weeks twice and said he had not been both times. (R. 451, 504.) So, the ALJ opted for two denials of depression across a fifteen-month period over the opinions of two doctors.

Again, that is difficult reasoning to accept. It's especially difficult because, as the Seventh Circuit has explained, mental illness symptoms are apt to wax and wane. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). "[A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about h[is] overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).

Here, the ALJ plucked two snapshots from the medical record in order to reject the only two medical opinions she had to consider. That was improper. *See Cole*, 2016 WL 3997246, at *4 (criticizing ALJ for cherry-picking from the record); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (Seventh Circuit pointing out that selecting one positive

mental health assessment from the record was "precisely the type of cherry-picking of the medical record that we have repeatedly forbidden.").  Moreover, as the ALJ points out in dismissing her opinion on Claimant's seizure disorder, Dr. Crawford is a family physician, not a mental health professional.  As she was treating Claimant for his seizures, she was unlikely to assess his mental health to any great degree and might not have even been competent to diagnose it.  *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995).

### B. The ALJ's RFC Determination

Even if these foregoing problems are set aside, Claimant also has a valid point about the ALJ's RFC determination.  The ALJ found that Claimant had the capacity to perform work at all exertional levels with certain additional limitations, including being restricted to work that involved no more than simple, routine, and repetitive tasks.  According to the ALJ, this restriction accounted for Claimant's "reduced memory, focus, and concentration" (R. 25), *i.e.*, Claimant's moderate difficulties with concentration, persistence, and pace.  The ALJ employed those limitations in her hypothetical to the VE, asking her to confine her examples to jobs involving no more than "simple, routine, repetitive  tasks consistent with unskilled work."  (R. 59.)  But, as the Claimant points out, the Seventh Circuit has made clear that's not necessarily adequate.

An ALJ's hypothetical must account for all of the claimant's limitations, including deficiencies of concentration, persistence, and pace.  *O'Connor-Spinner,* 627 F.3d 627, 619 (7th Cir. 2010), *Simila v. Astrue,* 573 F.3d 503, 520-21 (7th Cir. 2009).  Restrictions to unskilled work, simple, repetitive tasks, or other similar restrictions do not adequately account for moderate problems of concentration, persistence and pace.

*O'Connor–Spinner,* 627 F.3d at 620; *see also Taylor v. Colvin,* – F.3d –, –, 2016 WL 3916014, at *2 (7th Cir. July 20, 2016)(Seventh Circuit has rejected "the view that confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." (quotations omitted)); *Hemphill v. Colvin*, No. 14 C 3450, 2015 WL 9460140, at *12 (N.D. Ill. Dec. 23, 2015)(ALJ failed to account for moderate limitations on concentration, persistence, and pace by limiting claimant to "simple routine and repetitive tasks performed in a work environment free of fast paced production requirements, involving only simple work related decisions with few if any workplace changes.").  A simple job that is easy to learn and requires repetitive tasks may, nevertheless, be outside the capacity of someone who has deficiencies in concentration, persistence, or pace.  *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015).  The ALJ failed to account for that possibility in this case and a remand is necessary.

The Commissioner submits that the ALJ's RFC, and hypothetical to the VE, were adequate because the limitation to simple, routine, and repetitive tasks was taken from the state agency physician's opinion that Claimant could learn simple instructions and do one-to-two step tasks.  It is true that Dr. Travis advanced that opinion, but the ALJ rejected it.  She specifically said that she "does not find that the claimant should be limited to one or two step tasks."  (R. 25.)  As such, the Commissioner is supplying reasoning that is not a part of the ALJ's opinion.  The Court is limited in its review to the ALJ's rationale.  *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015); *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014).

Moreover, the VE testified that Claimant's past work as a custodian or institutional

17

cleaner had a skill level – SVP – of two, and the ALJ followed that testimony in her decision. At level two, a worker must be able to "[a]pply commonsense understanding to carry out *detailed* but uninvolved written or oral instructions. Deal with problems involving *a few concrete variables* in or from standardized situations." http://www.occupationalinfo.org/appendxc_1.html (emphasis supplied). Detailed instructions and more than one or two variables mean that such work is likely beyond an individual who can only handle one- or two-step tasks.

By contrast, at level one, a worker is required to "[a]pply commonsense understanding to carry *out simple one- or two-step instructions.* Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." http://www.occupationalinfo.org/ appendxc_ 1.html (emphasis supplied). That might be a better fit for the Claimant's RFC, but that's not what the VE testified the Claimant could do and it's not what the ALJ found in her decision. The ALJ's alternative step-five finding is no better: all three of the examples the VE provided and the ALJ accepted are SVP level two jobs. So even if the ALJ had accepted Dr. Travis's opinion, there would still be a gap in the path of her reasoning.[1]

### C. The Claimant's Assertions as to his Symptoms

There is already sufficient cause for a remand of this case, but it is worthwhile to

---

[1] Continuing to leave the ALJ's decision behind – and, indeed, the record – the Commissioner argues that the VE testified that "the other jobs available under the hypothetical are occupations that are generally performed as one-to-two-step tasks . . . ." (Commissioner's Memorandum, at 7). The Commissioner does not offer a citation to this testimony, probably because the VE actually testified that she could not measure the steps the work required because she didn't think any of the resources she had showed that. (R. 64.) The VE said only that the jobs involved one- or two-step instructions. (R. 64.) But even that testimony conflicts with the Dictionary of Occupational Titles, which categorizes the alternative jobs as level two reasoning jobs which, involve *detailed* instructions. Again, the Court has to confine itself to the ALJ's reasoning, but even if it didn't, this argument mischaracterizes the VE's testimony and ignores the evidence.

briefly address the Claimant's concerns about the ALJ's determination that his allegations as to his symptoms and limitations were not credible. The SSA recently updated its ruling on how ALJ's should assess a claimant's allegations, replacing Social Security Ruling 96-7p with Social Security Ruling 16-3p. Under the new ruling, ALJs will no longer assess the "credibility" of a claimant's statements, but should instead focus on determining the "intensity and persistence of [the applicant's] symptoms." SSR 16-3p, 2016 WL 1119029 (March 16, 2016). "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole*, 2016 WL 3997246, at *1 (emphasis supplied). Nothing else has changed, however; an ALJ must still provide good reasons for rejecting a claimant's assertions as to his pain and limitations. SSR 16-3p, 2016 WL 1119029, at *7.

Here, in rejecting Claimant's allegations, the ALJ focused on his lack of treatment and non-compliance with his medication regimen, and his ability to work in the past despite his seizure disorder and learning disability. The ALJ also rejected Claimant's allegations that his medication made him drowsy, and that he had trouble filling out applications for employment without assistance.

A Claimant's course of treatment (or lack thereof) or non-compliance with a medication regimen can be a basis for questioning his allegations, but the ALJ must inquire into any reasons for that lack of treatment or non-compliance. SSR 16-3p, 2016 WL 1119029, at *7; *Cole*, 2016 WL 3997246, at *3; *Thomas*, 826 F.3d at 961. The

Commissioner submits that the ALJ did inquire into Claimant's reasons for non-compliance with his medication regimen, but the testimony the Commissioner cites to does not support this assertion. A review of the transcript reveals that none of the passages cited involve the ALJ asking the Claimant why his Dilantin levels were low on those occasions.

First, the ALJ asked Claimant if he was on any medications at the time of the hearing, and Claimant confirmed that he was taking Dilantin. Next, when the Claimant said he had a seizure a week before the hearing, the ALJ again asked if he was taking his medication. The Claimant said he was, and the ALJ does not indicate that this was an occasion when Claimant's therapeutic levels were low. The final passage is not a line of questioning from the ALJ, but from Claimant's attorney, during which Claimant states that since he's been taking medication, he got seizures every two or three months.

The administrative hearing in a Social Security disability case is not an adversarial proceeding. *Williams v. Colvin*, 757 F.3d 610, 614 (7th Cir. 2014); *Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997). Clearly, the idea behind the requirement that an ALJ explore reasons for lack of treatment or failure to take medication religiously is not to trap a Claimant – especially one with a learning disability and borderline intelligence – into contradicting the record. The idea is to see if there is any explanation for a failure to follow prescribed treatment. The passages the Commissioner cites demonstrate that's not a question the ALJ bothered to ask here.

Further, the fact that Claimant had been able to work in the past despite his impairments does not necessarily undermine his claim that he cannot work now. The

Claimant testified that he lost his last two jobs due to having seizures at work. And, as the Seventh Circuit has said, the fact that an individual works does not mean they are not disabled – paradoxical though that may seem. *See Goins v. Colvin*, 764 F.3d 677, 679 (7th Cir. 2014)("... even persons who are disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits."); *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013)(pointing out that an employer may be lenient or altruistic and a claimant may be desperate). As with Claimant's course of treatment, a bit more investigation might have produced a more accurate picture.

Finally, as for side effects from Claimant's medication and his ability to fill out forms, the ALJ should have explored these areas as well. Drowsiness and dizziness are, indeed, possible side effects of Dilantin, as are headaches, which Claimant also claimed to have. http://www.rxlist.com/dilantin-side-effects-drug-center.htm ("Common side effects of Dilantin include headache, ... dizziness, drowsiness, ... sleep problems (insomnia), ....."). And, it is not the case that Claimant never reported side effects to his doctor, as she clearly states that he experiences lightheadedness and lack of alertness in her report, and also noted that he complained of dizziness. In any event, the failure to report side effects to a physician is not a sound basis for rejecting a claimant's assertions. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

As for the forms issue, the Claimant didn't testify that this was the only thing that kept him from working – just that he had trouble with it. Moreover, a perusal of the forms the ALJ pointed out Claimant was able to complete tends to show that Claimant was absolutely right. The ALJ said that Claimant was able to fill out his application for disability benefits without trouble, but Claimant applied for benefits over the telephone.

21

The forms he *did* fill out are barely legible and often make no sense.  For example, when asked how his impairment limits his ability to work, he wrote: "Deisure [sic]."  (R. 246.) When asked how his illness affected his sleep, he wrote: "I need illnesses."  (R. 247.) To explain how his condition affected his ability to dress, he wrote: "Dress."  (*Id.*) "Wotching [sic] in a writing paper" was how he remembered to take his medication.  (R. 248.)

The list of examples could continue but, the point is, it is highly likely that an employer would reject such an application, even for unskilled work.  Moreover, it is certainly not clear that Claimant lied about his limitation in this regard, as the ALJ assumed he did.

## IV.  CONCLUSION

For the foregoing reasons, the Claimant's motion for summary judgment (Dkt. 18) is granted and the Commissioner's cross motion for summary judgment (Dkt. 22) is denied.  This matter is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

ENTERED:

_____

**Michael T. Mason**
**United States Magistrate Judge**

**DATED: September 15, 2016**